**SECOND DIVISION**
**ANDREWS, P. J.,**
**MCFADDEN and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A1486. GEORGIA DEPARTMENT OF TRANSPORTATION
    v. OWENS et al.

A14A1487. C.W. MATTHEWS CONTRACTING COMPANY,
    INC. v. OWENS et al.

ANDREWS, Presiding Judge.

These interlocutory appeals arise out of an action by Pamela and Ronnie Owens, individually and as parents and personal representative of the Estate of Christopher Rondale Owens ("Owens"), Ryan Montgomery, and Scottie Joseph Thibodaux ("Appellees") against C.W. Matthews Contracting Company, Inc. ("CW Matthews"), the Georgia Department of Transportation ("GDOT"), and other defendants asserting claims of negligence and wrongful death arising out of a collision at a construction site along Interstate 75/85 ("I-75/85") in Atlanta in which Owens was killed and Montgomery and Thibodaux suffered severe injuries. In Case

No. A14A1487, CW Matthews appeals from the trial court's order denying its motion for reconsideration of the trial court's prior order denying in large part CW Matthews' motion for summary judgment, which had argued, among other things, that Appellees could not establish proximate causation.[1] CW Matthews also appeals from the trial court's orders denying motions to exclude testimony of two of Appellees' experts. In Case No. A14A1486, GDOT appeals from the trial court's order denying its motion to dismiss based on sovereign immunity and the same orders at issue in Case No. A14A1487 denying the motions to exclude expert testimony. In Case No. A14A1487, we affirm the trial court's order denying summary judgment, concluding that proximate causation is a question of fact. In Case No. A14A1486, we affirm in part and reverse in part the trial court's order denying GDOT's motion to dismiss, concluding that GDOT is entitled to immunity from claims relating to approval of traffic control plans for the construction site and on-site inspection of CW Matthews' traffic control activities. In both cases, we affirm the trial court's order denying the parties' motion to exclude Jeffrey Kidd's testimony but affirm in part and vacate in part its order on the motion to exclude Ruston Hunt's testimony.

---

[1] The trial court granted summary judgment in CW Matthews' favor on the Owens' estate's claim for pain and suffering.

In an appeal from the denial of a motion for summary judgment, we conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006). So viewed, the record shows that Owens, Thibodaux and Montgomery, all members of the U.S. Army stationed at Fort Benning, drove to Atlanta in a rented Jeep Patriot to spend the weekend of May 14, 2010 there and celebrate with one of their friends, Aleyda Amaya, who was being relocated. Montgomery testified that when they went out in Atlanta on the evening of May 15, 2010, Owens was the designated driver because he was not the "party" type . Owens, Thibodaux and Montgomery met Amaya and others at the nightclub Esso. One of Amaya's friends saw Owens with a drink in his hand at the nightclub but testified that he did not look intoxicated at any point that evening. Owens, Thibodaux, Montgomery and their friends left Esso between 2:00 and 3:00 a.m. Amaya's friend testified that the group planned to meet at a Waffle House but that Owens, Thibodaux and Montgomery were going to make one stop first.

In the early morning of May 16, 2010 while it was still dark, CW Matthews, a contractor for GDOT on a project called the 14th Street Bridge project, was

3

conducting repaving work on the right shoulder on the southbound side of I-75/85 just north of the 10th Street Bridge in Atlanta.[2] At approximately 5:00 a.m., Garth Barnett, a contract dump truck driver, was planning to deliver his last load of asphalt for the night to the construction site. In a discovery response, Barnett stated that his dump truck was among other dump trucks approaching the work site at around 40 miles per hour or less. He slowed some more as the dump truck ahead of him prepared to pass through the placards marking the path to move to the end of the line of trucks ahead of the paver on the shoulder. Barnett testified that he was in the second lane over from the right shoulder (the "second lane"). Barnett first testified that the second lane was not an open lane of travel at the time but then stated that he could not recall whether it was open. He believed, however, that at least at some point along the roadway, two right lanes were closed. Barnett told police that he was driving approximately 25 miles per hour in the second lane when Owens' Jeep struck his dump truck from behind. At the time of the collision, Barnett had activated the four-way flashers on his truck, and he had reflective tape on the back of the vehicle.

_____

[2] The 14th Street Bridge project was a multi-year project encompassing more than the repaving work at issue in this case.

Montgomery and Thibodaux were both asleep when the collision occurred. Montgomery testified that at the time of the collision, Owens had not slept since waking up Saturday morning. Post-mortem tests showed that Owens' blood alcohol content was .069. The crash data retrieval report produced from the Jeep's airbag control module ("CDR report") revealed that in the five seconds prior to the crash, Owens was traveling 70 miles per hour, the engine throttle percentage remained relatively constant at approximately 17 percent, and Owens did not brake. The posted speed limit in the area where the accident occurred was 55 miles per hour.

Charles Payne, another dump truck driver, testified that he was driving southbound on I-75/85 when he saw Owens' Jeep merge onto I-75/85 from Interstate 85 in his left rearview mirror. According to Payne, as soon as the Jeep passed him, it swerved in front of him and veered across four or five lanes of traffic without signaling and collided with Barnett's dump truck. Payne estimated that the Jeep hit Barnett's dump truck at an angle of about 45 degrees. Barnett thought that if the Jeep had not hit the dump truck it would have kept going and hit the CW Matthews work crew.

Police officer Nadia Byrd witnessed the collision from behind while she was about one and a half car lengths away in the far right lane (the "first lane"). At the

5

time, Byrd was providing a police presence behind the cone truck that was setting up a lane closure closing the first lane. She had flashing lights on the top and in the rear window of her vehicle. Byrd testified that Barnett's dump truck was in the second lane at the time of the collision, which was an open lane of travel, and that it appeared that Barnett had slowed to try to get in the lane closure. She thought Barnett's truck was going 15 miles per hour or less. Byrd did not see the Jeep until it passed her but testified that it was coming "straight on" when it hit Barnett's truck.

Maurice Harrell was sitting in his dump truck on the right shoulder about three truck lengths ahead of Barnett's truck at the time of the collision. According to Harrell, the Jeep was in a closed lane of travel at the time of the accident. He stated that CW Matthews' dispatcher had advised truck drivers that "we need to enter the project . . . inside those two right lanes that we were working in."

Lights from various sources illuminated the area where the collision took place, including from street lights, surrounding commercial buildings, and halogen lights mounted on construction equipment. Signs ahead of the construction site stated that one right-hand lane was closed. The lane closure began with a series of barrels tapering to the left, and an arrow board at the beginning of the taper directed motorists to move left.

Marvin Dunson, CW Matthews' division manager for asphalt lay down, testified that any time there is going to be a lane closure the plans will be submitted to GDOT in advance in a traffic interruption report ("TIR"). Dunson also stated that GDOT's policy was that CW Matthews could not close down more lanes than specified in the TIR but could decide to close less. If CW Matthews changed the lane closure plan, it would notify GDOT. Dunson stated that CW Matthews initially planned to close the right shoulder and two right-hand lanes because he was uncertain if the planned work would extend into the first lane. When he realized it would not, he decided to close one lane. According to Dunson, truck drivers were instructed that once they passed the taper and all of the equipment with flashing lights, they could enter the project where they feel safe to do so. Rob Lovett, CW Matthews' project night superintendent for traffic control, testified that he may release traffic once the lane closure extends past the paving equipment. Prior to the collision, he released traffic before all of the panels closing the first lane were in place.

Dunson testified that after he was notified of the accident, he drove past the lane closure to get to the scene and saw that only one lane was closed. When he got to the accident scene and noticed that the Jeep was in a live lane of traffic, he took some panels and moved them to incorporate that lane into the lane closure. The first

responders also started moving panels around. Dunson testified that at some point the lane closure was extended to allow the paving crew to finish its work and remove the equipment while the accident investigation was going on. Dunson admitted, however, that a photo Lovett took minutes after the accident showed a line of panels closing two lanes south of the accident past the 10th Street Bridge. Dunson could not say who would have moved those panels.

Herman Hill, Appellees' engineering expert, testified that because of the limited work space at the construction site and various factors affecting the visibility of work trucks in the roadway, a double lane closure was needed to allow trucks to access the work site more easily; that to the extent a single lane was closed, there should have been a sign warning motorists that trucks would be entering or leaving the work site, a larger opening for trucks to enter the work site, and a reduced speed limit; and that CW Matthews failed to adequately instruct truck drivers on how to safely enter the work site and did not properly communicate its lane closure plans.[3] The opinions of Appellees' other experts are discussed in Division 1.

*Case No. A14A1487*

---

[3] We express no opinion here as to whether the evidence in this case supports a conclusion that CW Matthews breached a duty of due care.

1. CW Matthews argues that the trial court abused its discretion in denying its motions to exclude the expert testimony of Appellees' human factors expert, Ruston Hunt, and their accident reconstruction expert, Jeffrey Kidd. "The question of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." (Punctuation and footnote omitted.) *Ga. Dept. of Transp. v. Miller*, 300 Ga. App. 857, 860 (2) (686 SE2d 455) (2009). OCGA § 24-7-702 (b) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

We conclude that the trial court did not abuse its discretion except in declining to exclude Hunt's testimony that the signs in advance of the work site were inadequate. Accordingly, its order on the motion to exclude Hunt's testimony is vacated and

remanded with direction that the trial court enter an order consistent with this opinion.

(a) *Ruston Hunt.* Hunt has a bachelor of science and master's degree in industrial engineering and a PhD in mechanical engineering. He is dean of the Southern Polytechnic State University Extended University and has taught courses in human factors engineering for over 10 years. He has provided human factors consulting services since 1980 and has authored numerous articles on human factors engineering.

Hunt testified in his deposition that, in his opinion, Barnett's slow-moving dump truck in an open lane of traffic presented an unexpected hazard to a motorist like Owens. He identified factors that would have made it difficult for Owens to perceive and react to Barnett's truck, namely, the many light sources that created "visual clutter," and the configuration of the dump truck's brake lights. Hunt also opined that the signs ahead of the work site were "inadequate."

Hunt has considerable credentials with respect to the research, study and application of human factors engineering, and the trial court was authorized to conclude that he is qualified to render opinions with respect to issues such as driver expectation and Owen's ability to perceive Barnett's dump truck. See *Ahuja v.*

10

*Cumberland Mall, LLC*, 821 FSupp2d 1317, 1322 (N.D. Ga. 2011) (Hunt qualified in slip and fall case to opine on how reasonable mall patron would perceive site of accident).

We disagree with CW Matthews that the trial court was required to conclude that Hunt's opinions on those issues are unreliable.

> Reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training. There are many different kinds of experts and many different kinds of expertise, and it follows that the test of reliability is a flexible one.

(Citations and punctuation omitted.) *HNTB Georgia v. Hamilton-King*, 287 Ga. 641, 642-643 (1) (697 SE2d 770) (2010). Hunt's human factors theories have been subject to publishing and peer review. See *Ahuja*, supra, 821 FSupp2d at 1323. Hunt has extensive experience in the application of human factors theories, and although he has primarily appeared as an expert witness in product liability cases, he has applied his knowledge in premises liability cases involving visibility and perception issues and in several automobile collision cases. Hunt's opinions related to driver expectations

11

and factors affecting Owens' ability to see and perceive Barnett's dump truck are based on his knowledge and experience and his review of materials including photographs and depositions. Contrary to CW Matthews' argument, they are not purely speculative. No one will ever know precisely what Owens saw or did just before the collision, but that in and of itself does not mean Hunt's opinions are without foundation. We have held that "[t]he appropriate standard for assessing the admissibility of the opinion of the expert is not whether it is speculative or conjectural to some degree, but whether it is wholly so." *Savannah Cemetery Group v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 213 (3) (704 SE2d 858) (2010). Even if the trial court might have exercised its discretion differently, we cannot say that it abused its discretion by declining to exclude Hunt's opinions on driver expectations and factors affecting Owens' ability to see and perceive the dump truck.

We conclude, however, that the trial court abused its discretion in declining to exclude Hunt's opinion that the signs posted ahead of the construction site were "inadequate." This is in effect an opinion that CW Matthews breached an applicable standard of care. Hunt conceded in his deposition that he was not aware of the generally accepted standards governing traffic control on an Interstate and does not hold himself out as an expert in traffic control. See *HNTB Georgia*, supra, 287 Ga.

12

at 644-646 (expert opinion on standard of care properly excluded when its only foundation was inapplicable experience).

(b) *Jeffrey Kidd*. Kidd was a charter member of the Georgia State Patrol's Specialized Collision Reconstruction Team in 1997 and over the next 10 years aided in the reconstruction of over 1500 fatal collisions. He has been involved in the investigation or reconstruction of over 3000 vehicle collisions in his career. He testified that in his opinion Owens was not asleep at the time of the collision. Kidd also opined that the speed of Barnett's truck combined with other factors created a conspicuity issue. He further testified that the brake lights on Barnett's truck were optically connected with the flashers such that no separate brake lights came on if the brakes were applied while the flashers were on and that this would have made it more difficult to discern that Barnett was slowing down.

CW Matthews does not dispute Kidd's qualifications as an accident reconstruction expert but contests the reliability of Kidd's opinions on the ground that Kidd did not actually perform an accident reconstruction. Kidd testified that he holds himself out as an expert in accident reconstruction, "which encompasses a great deal or different areas," including considering issues related to "conspicuity." Kidd did not testify that any of his opinions are based on what a complete accident reconstruction

13

might show in this case; rather, his opinions relate only to particular aspects of the collision.

With respect to his opinion that Owens was not asleep at the time of the collision, Kidd testified that in his opinion Owens would not have been able to negotiate the topography prior to the collision if he were asleep, as there was a curve to the left, to the right, and then back to the left. He also relied on the CDR report and opined that Owens could not have maintained a constant speed and throttle position if he were asleep. Based on the data in the CDR report, he also concluded that the collision was essentially an in-line collision with an angle of impact of approximately six degrees and stated that the in-line nature of the collision supported his opinion that Owens was not asleep. In reaching his opinion, Kidd also drew on his experience in investigating accidents involving drivers who had fallen asleep. Kidd's opinions were based on an application of his knowledge and experience to objective facts and data, and his conclusions could be tested. The trial court did not abuse its discretion in denying the motion to exclude as to the opinion that Owens was not sleeping at the time of the collision.

Regarding Kidd's other opinions, CW Matthews raises various criticisms, including that Kidd did not actually inspect the truck or conduct a line of sight

14

analysis. The record reflects that Kidd received and reviewed evidence and materials related to this case, including photographs of the accident scene and Barnett's dump truck. He also reviewed videos showing how the dump truck's lights functioned. As the trial court could have found that Kidd reliably applied his experience in accident reconstruction and investigation to reach conclusions about factors that may have impeded Owens' ability to see or respond to the dump truck, we find no manifest abuse of discretion in the trial court's refusal to exclude his opinions.

2. CW Matthews argues that the trial court erred in failing to grant its summary judgment motion as to all of Appellees' claims because undisputed record evidence establishes that Owens' own negligent, reckless and unlawful conduct was the sole proximate cause of Appellees' injuries. We cannot agree.

"Negligence is not actionable unless it is the proximate cause of the injury." (Citation and punctuation omitted.) *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 273 (1) (578 SE2d 106) (2003). CW Matthews asserts repeatedly that Owens' negligent and unlawful driving was an intervening cause of Appelles' injuries that shields it from liability because CW Matthews did not cause Owens to drive the way he did or to violate the rules of the road. This argument reflects an incomplete understanding of the law of proximate causation.

Proximate cause is "that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." (Citation and punctuation omitted.) *Reed v. Carolina Cas. Ins. Co.*, 327 Ga. App. 130, 132 (2) (762 SE2d 90) (2014). "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." *Delta Airlines v. Townsend*, 279 Ga. 511, 515 (1) (614 SE2d 745) (2005). With regard to intervening acts, our Supreme Court has explained: "the general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act . . . was such that its probable or natural consequences could reasonably have been . . . foreseen by the original wrong-doer, the causal connection is not broken." (Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002).

> While it is true that if the act of the original wrong-doer should set in motion other causal forces such as would naturally produce the injury, he may be held liable although his own negligence was not the immediate cause of the injury, *this is only one theory of liability,*

16

because, even where there is no such setting in motion, the original wrong-doer may still be held liable, if the intervening agency could reasonably have been anticipated or foreseen by him.

(Emphasis supplied.) *Williams v. Grier*, 196 Ga. 327, 337 (2) (26 SE2d 698) (1943); see also *Stern v. Wyatt*, 140 Ga. App. 704, 705 (1) (231 SE2d 519) (1976). The latter rule applies even with respect to an intervening criminal act or act of negligence. *Williams*, supra, 196 Ga. at 338 (2); *Smith v. Commercial Transp.*, 220 Ga. App. 866, 867 (1) (470 SE2d 446) (1996). It is also well-settled under Georgia law that "the proximate cause of an injury may be two separate and distinct acts of negligence acting concurrently." *Hayes v. Crawford*, 317 Ga. App. 75, 78 (730 SE2d 26) (2012). The issue presented in this case is not whether CW Matthews caused Owens' manner of driving but whether CW Matthews could have anticipated Owens' driving and the ensuing collision such that CW Matthews' alleged negligence may constitute at least one proximate cause of the Appellees' injuries.

In conducting the foreseeability analysis, "the relevant inquiry is not whether the exact intervening negligent act was foreseeable, but whether, as a general matter, the original negligent actor should have anticipated that this general type of harm might result." *Smith*, supra, 220 Ga. App. at 867 (1). We cannot say that it was

unforeseeable as a matter of law that a vehicle, including one that was speeding or proceeding with less than due care, might collide with a dump truck proceeding well below the speed limit on the Interstate in the early morning darkness. While CW Matthews argues that there was no reason for Owens to move into the second lane next to the work area, that lane was open, it was not unlawful to drive in it, and a driver who, for example, was planning to exit might choose to do so. Given the conflicts in the evidence, issues relating to Owens' degree of fault, such as the extent to which the lighting present would have aided or hindered Owens in recognizing and responding to the dump truck and whether Owens was even conscious and in control of his vehicle at the time of the collision must be resolved by the finder of fact.[4]

"Questions of negligence and diligence and of cause and proximate cause and whose negligence constituted the proximate cause of the plaintiff's injuries are, except in plain, palpable and indisputable cases, solely for the jury." (Citations and

---

[4] The cases upon which CW Matthews relies involve collisions occurring under much different circumstances than those presented here. See, e.g., *Ferrell v. United Water Svcs. Unlimited Atlanta*, 271 Ga. App. 887, 887-888 (611 SE2d 126) (2005) (it was undisputed that truck driver ran into parked van on a clear day with excellent visibility and the truck driver, who was under the influence of cocaine and morphine, admitted that he saw the van and attempted to brake but stepped on the gas pedal instead); *Watson v. Marshall*, 212 Ga. App. 206, 207 (1) (441 SE2d 427) (1994) (motorist exited one Interstate in dense fog and then, without confirming where she was going, turned the wrong way onto another Interstate).

punctuation omitted.) *Hayes*, supra, 317 Ga. App. at 79. While it is certainly possible that a jury may conclude that Owens should shoulder all of the blame for the collision at issue, we cannot agree that no issue of material fact exists in this regard.

3. Relying on *Fraker v. C.W. Matthews Contracting Co.*, 272 Ga. App. 807 (614 SE2d 94) (2005) and *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342 (568 SE2d 559) (2002), among other precedent, and the non-negligent government contractor defense, CW Matthews argues on appeal that it is entitled to summary judgment with respect to any claims that the traffic control plan was negligently designed in that it caused trucks to slow to an unreasonably slow speed in an open travel lane. While CW Matthews raised the non-negligent government contractor defense in its motion for summary judgment, it argued only that the defense entitled it to summary judgment to the extent that Appellees alleged CW Matthews was negligent in failing to post a sign in advance of the work area stating that trucks were entering and exiting the highway. CW Matthews did not argue that its defense extended to claims relating to aspects of the traffic control plan that may have affected the speed of work trucks attempting to enter the work site. "Issues presented for the first time on appeal furnish nothing for us to review, for this is a court for correction of errors of law committed by the trial court where proper exception is taken." (Footnote and punctuation

19

omitted.) *Crippen v. Outback Steakhouse Intl.*, 321 Ga. App. 167, 170 (1) (741 SE2d 280) (2013).[5]

### Case No. A14A1486

4. GDOT argues that the trial court erred in denying its motion for summary judgment on the basis of sovereign immunity. We agree in part.

"We review de novo a trial court's ruling on a motion to dismiss based on sovereign immunity grounds, which is a matter of law. Factual findings are sustained if there is evidence supporting them, and the burden of proof is on the party seeking the waiver of immunity." (Citation and punctuation omitted.) *Bd. of Regents of the Univ. Sys. of Ga. v. Canas*, 295 Ga. App. 505, 509 (3) (672 SE2d 471) (2009).

Under the state constitution, "sovereign immunity insulates the state and its departments and agencies from liability except to the extent that the legislature enacts a specific waiver." *Southerland v. Ga. Dept. of Corrections*, 293 Ga. App. 56, 57 (1)

---

[5] In its summary judgment briefing below, CW Matthews concluded its argument on the non-negligent government contractor defense with the following statement: "Based on the record presented in this case [CW Matthews] is entitled to summary judgment on Plaintiffs' claim that [CW Matthews] is liable for failure to adequately warn of trucks exiting and entering the lane closure and any other similar theory of negligence regarding highway traffic control design." We do not think this vague reference to other similar claims was sufficient to alert the trial court that it should consider CW Matthews' new and broader argument and any new or different evidence upon which it may depend.

20

(666 SE2d 383) (2008); Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). Pursuant to the Georgia Tort Claims Act ("GTCA"), the General Assembly has waived the State's immunity "for the torts of state officers and employees while acting within the scope of their official duties or employment . . . [but] only to the extent and in the manner provided in [the GTCA]." OCGA § 50-21-23 (a) and (b). A "state officer and employee" under the GTCA does not include an "independent contractor doing business with the state." OCGA § 50-21-22 (7). In addition, the GTCA includes the following exceptions, among others, to the waiver of immunity:

(8) Inspection powers or functions, including failure to make an inspection or making an inadequate or negligent inspection of any property other than property owned by the state to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety;

(9) Licensing powers or functions, including, but not limited to, the issuance, denial, suspension, or revocation of or the failure or refusal to issue, deny, suspend, or revoke any permit, license, certificate, approval, order, or similar authorization; [or]

(10) The plan or design for construction of or improvement to highways, roads, streets, bridges, or other public works where such plan or design is prepared in substantial compliance with generally accepted

21

engineering or design standards in effect at the time of preparation of the plan or design.

OCGA § 50-21-24.

Traffic control is governed by Section 150 of the contract between GDOT and CW Matthews, which states: "This section as supplemented by the Plans, Specifications, and Manual on Uniform Traffic Control Devices (MUTCD) shall be considered the Traffic Control Plan." Specification 9106 provided detailed standards for setting up traffic control for single and double lane closures. Hill, Appellees' engineering expert, testified that "I think MUTCD is easily recognized as industry standard. I think in Georgia, Georgia standard 9106 is easily accepted as an industry standard. I think section 150 of . . . every DOT contract that I know of . . . is an industry standard as far as how you handle traffic control." As articulated by Hill, Appellees' negligence claims relate not to any fault in the general traffic control plan and standards to be applied to the 14th Street Bridge project but to the failure to make appropriate modifications to them with respect to the particular paving work taking place at the time of the collision. He stated for example that MUTCD "brings in the idea that there is an assessment that's required in order to apply" the manual's standards and that with respect to MUTCD and Standard 9106, "there's always going

to be some type situations that just need to be adjusted." He testified further that "the MUTCD as well as 9106 . . . it's not just a recipe . . . [B]ecause of road configurations many times you're going to have to make adjustments."

GDOT maintains that in light of Hill's testimony and the design/plan exception in OCGA § 50-21-24 (10) of the GTCA, it cannot be liable for furnishing the basic traffic control plan to CW Matthews. GDOT further argues that it cannot be liable for any alleged failure to make appropriate site-specific modifications to the basic plan or any alleged negligence in implementing traffic control at the construction site because it permissibly delegated those responsibilities to an independent contractor and its role with regard to these activities was limited to approving CW Matthews' plans and inspecting CW Matthews' work for contract compliance purposes. GDOT maintains that it is entitled to immunity for its approval and inspection activities pursuant to the inspection powers or functions exception in OCGA § 50-21-24 (8) and the licensing powers or functions exception in OCGA § 50-21-24 (9).

Section 150 supports GDOT's characterization of its traffic control responsibilities. Regarding responsibility for implementing traffic control plans, Section 150 (A) provides:

23

The Contractor shall designate a qualified individual as the Worksite Traffic Control Supervisor (WTCS) who shall be responsible for selecting, installing and maintaining all traffic control devices in accordance with the Plans, Specifications, Special Provisions and the MUTCD. . . The WTCS shall be available on a full-time basis to maintain traffic control devices . . . The WTCS shall regularly perform inspections to ensure that traffic control is maintained.

GDOT's rights to inspect on-site traffic control activities are reflected in the same subsection as follows: "[t]he [GDOT Project] Engineer will periodically review the work for compliance with the requirements of the traffic control plan." Section 150.01 (G) indicates that GDOT's role regarding modifications to the basic traffic control requirements to meet the conditions of a specific site are confined to approving such modifications. That subsection states:

Any Sequence of Operations provided in this Contract in conjunction with any staging details which may be shown in the plans, *is a suggested sequence for performing the Work . . . The Contractor shall develop detailed staging and traffic control plans for performing specific areas of the Work* including but not limited to all traffic shifts, detours, bridge widenings, paces, or other activities that disrupt traffic flow. The Engineer may require detailed staging and traffic control plans for lane closures. These plans shall be submitted for approval at least two weeks prior to the scheduled date of activity.

(Emphasis supplied.) It further states:

> The Contractor shall secure the Engineer's approval of the Contractor's proposed plan of operation, sequence of work and methods of providing for the safe passage of vehicular and pedestrian traffic before it is placed in operation. *The proposed plan of operation shall supplement the approved traffic control plan.* Any major changes to the approved traffic control plan, proposed by the Contractor, shall be submitted to the Department for approval.

> Some additional traffic control details will be required prior to any major shifts or changes in traffic. The traffic control details shall include, but not be limited to, the following: . . . 2. The location, size, and message of all signs required by the MUTCD, Plan, Special Provisions, *and other signs as required to fit conditions*.

(Emphasis supplied.)

While Section 150 places responsibility on CW Matthews in the first instance to modify the traffic control standards to fit conditions, there is some testimony indicating that the relationship functioned otherwise in practice.[6] For example, while she gave various and sometimes conflicting responses when questioned on this issue, the GDOT project manager testified that if anyone had responsibility to assess what

---

[6] We also note that while Section 150 and Standard 9106 are in the record, the entire contract between CW Matthews and GDOT is not.

traffic control measures were needed for a particular aspect of the project, it was GDOT's project engineer. Jeff Duncan, CW Matthews' General Superintendent, testified that when implementing a lane closure, CW Matthews will put up signs per the standard plan and "if we're approached by the DOT to add something else we will discuss it at that point. But we do not arbitrarily make those decisions ourselves."

We now examine the relevant exceptions to the waiver of sovereign immunity in the GTCA in view of the contract provisions and testimony discussed above.

(a) *Design/plan exception.* The record supports GDOT's argument that it cannot be liable simply for furnishing the basic traffic control plan reflected in Section 150 of the contract, as Appellees' own expert conceded that it represented the industry standard. Given that there is at least some evidence in the record that GDOT exercised responsibility for proposing rather than merely approving site-specific modifications, we cannot conclude that the trial court erred in denying GDOT's motion to dismiss on claims relating to an alleged duty to modify the basic traffic control plan. Compare *Comanche Constr., Inc. of Ga. v. Dept. of Transp.*, 272 Ga.

App. 766, 768 (2) (613 SE2d 158) (2005) (record belied plaintiff's allegation that GDOT assisted in designing traffic control plan) (physical precedent).[7]

(b) *Licensing powers/functions exception*. Contrary to CW Matthews' argument, this exception, by its plain terms, is not strictly limited to decisions related to permits or licenses. Instead, it also applies as to decisions relating to issuance, denial, suspension, or revocation of *approvals*. We recently held in *Dept. of Transp. v. Kovalcik*, that OCGA § 50-21-24 (9) shielded GDOT from liability for alleged negligence in its pre-construction approval of plans for a roadway improvement project. 328 Ga. App. 185, 189-191 (1) (b) (761 SE2d 584) (2014). We reach a similar result here regarding any claim based on GDOT's alleged negligence in approving a site-specific traffic control plan that was in effect on the date of the collision, and we reverse the trial court's order on GDOT's motion to dismiss to the extent that it failed to grant the motion as to this issue. See also *Reidling v. City of Gainesville*, 280 Ga. App. 698, 701 (1) (634 SE2d 862) (2006) (under OCGA § 50-21-24 (9), GDOT was immune from liability for involvement in approving disposal site for excess fill soil generated during parkway construction project); *Dept. of*

---

[7] We express no opinion on how conflicts in the evidence regarding GDOT's design role should be resolved.

*Transp. v. Cox*, 246 Ga. App. 221, 224 (540 SE2d 218) (2000) (under OCGA § 50-21-24 (9), GDOT was immune from liability based on issuing permit to build a commercial driveway and delay in issuing permit for installation of a traffic signal).

(c) *Inspection powers/functions exception*. The inspection powers/functions exception applies to a state officer or employee's alleged inadequate or negligent inspection of any property "*other than property owned by the state* to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety." (Emphasis supplied.) OCGA § 50-21-24 (8). Appellees argue that because the Interstate where construction was taking place was state property, the inspection powers/functions exception cannot apply. We disagree based on *Dept. of Transp. v. Jarvie*, _ Ga. App. _, 2014 WL 6092257 (2014), in which we held that GDOT was immune from liability under the inspection powers/functions exception for liability associated with monitoring compliance with conditions of GDOT's approval of a contractor's request to stockpile aggregate rock in the median in connection with a road-widening project on the Interstate. One such condition was submitting a traffic control plan with respect to the stockpile area. Id. at *1. We held that the GDOT's monitoring activity

amounts to oversight of construction activities for purposes of administering the contract, and it does not amount to an inspection of State property for regulatory compliance or safety hazards as contemplated by the language of OCGA § 50-21-24 (8). Absent a clear legislative directive, we decline to extend the waiver of sovereign immunity to include independent contractors'[] conduct even if a State actor in some way attempts to ensure that contractors are operating safely on a State-approved project.

(Footnote omitted.) *Jarvie*, supra, 2014 WL 6092257, at *3. As this analysis squarely applies here, we conclude that the trial court erred in failing to grant GDOT's motion with respect to claims related to GDOT's on-site inspection of CW Matthews' implementation of traffic control plans.

5. With respect to GDOT's appeal of the orders denying the motions to exclude the expert testimony of Hunt and Kidd, we reach the same conclusion as in Division 1 above.

*Judgment affirmed in part, reversed in part, and vacated in part in Case No. A14A1486. Judgment affirmed in part and vacated in part in Case No. A14A1487. McFadden and Ray, JJ., concur.*