**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 27, 2019**

# In the Court of Appeals of Georgia

A19A0361. THE GEORGIA DEPARTMENT OF TRANSPORTATION v. DELOR et al.          DO-014

A19A0362. C AND H PAVING, INC. v. DELOR et al.          DO-015

A19A0363. CSX TRANSPORTATION, INC. v. DELOR et al.          DO-016

A19A0364. DELOR et al. v. CSX TRANSPORTATION, INC.          DO-017

DOYLE, Presiding Judge.

Alexander Delor and John Harof, Jr. ("the decedents"), died in a motor vehicle accident when the car they were in spun off the road after traversing a railroad crossing that recently had been updated with concrete panels. The decedents' parents, David Delor and John Harof, Sr., sued the Georgia Department of Transportation ("GDOT"), CSX Railroad, and C and H Paving (hereinafter "C&H Paving"), which paved the crossing after installation of the panels. The parties filed various motions,

and the trial court granted some of them and denied others. We have consolidated the parties' subsequent interlocutory appeals for purposes of this opinion. In Case No. A19A0361, GDOT appeals the denial of its summary judgment motion, its motion to dismiss, and its motion to exclude the testimony of three of the plaintiffs' experts. In Case No. A19A0362, C&H appeals the denial of its summary judgment motion. In Case No. A19A0364, the plaintiffs appeal the grant of partial summary judgment to CSX on the issue of liability for a joint enterprise. In Case No. A19A0363, CSX appeals the denial of its summary judgment motion and its motion to exclude the testimony of two of the plaintiffs' experts. For the reasons that follow, we affirm in Case Nos. A19A0361, A19A0362, and A19A0364. In Case No. A19A0363, we affirm in part and reverse in part.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of

material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[1]

So viewed, the record shows that in January 2011, as part of a state-wide improvement project, GDOT contracted with CSX to install prefabricated concrete panels at a Milledgeville railroad crossing ("the crossing") that intersects with State Route 24 (also known as U. S. Highway 441).[2] The contract required CSX to purchase the materials, install the concrete panels, and hire a paving contractor; GDOT agreed "to provide the necessary road traffic control and detour signing during the installation of the prefabricated concrete crossing systems" and to supply a "representative who shall be responsible for the inspection of the work. . . ."

After receiving written authorization from GDOT to proceed, CSX and its paving subcontractor, C&H, performed the work on the crossing on September 14 and 15, 2011. GDOT barricaded the roadway on both sides of the crossing to close it to through traffic and installed warning signs and signage marking a detour route.

---

[1] (Punctuation and citation omitted.) *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

[2] OCGA § 32-2-2 (a) (2) requires GDOT to "control and supervis[e] . . . all funds appropriated for public road work," which includes "[r]ailroad grade crossings" pursuant to OCGA § 32-1-3 (24) (H).

3

CSX removed the existing track, cross-ties, and asphalt; dug a trench on the north and south sides for the new concrete panels; installed dirt and ballast, new cross-ties, and the prefabricated concrete panels; and filled the trenches with dirt. C&H then paved over the trenches with asphalt.

On September 15, 2011, GDOT's assistant area engineer, Bryan Haines, inspected the work at the crossing. At the conclusion of the inspection, Haines advised Norris Hunt (the CSX employee in charge of the work at the crossing) that he "would like to see a smoother transition on the paving, especially on the south side of tracks to provide a smoother ride and tie[-]in with the [highway]."[3] As he explained to Hunt, Haines's "goal was to obtain a smoother tie-in, . . . to try to get as smooth and enhanced ride-ability [sic] as possible for the traveling public." Chadwick Norris, C&H's paving crew chief, was present during the conversation between Haines and Hunt. Haines later testified at his deposition that he did not believe that the installers had the equipment necessary to properly pave the tie-in. CSX refused to perform additional paving work on the tie-ins, but agreed to pay for the additional asphalt, and

---

[3] Haines describes a tie-in as "an overlay between the concrete panels and blending in the transition back to our asphalt paving on our highway."

GDOT agreed to perform the additional paving.[4] Haines remained on-site until the construction detour was removed and the crossing was reopened. There were no warning signs put up to advise drivers of the unsatisfactory asphalt at the crossing.

On September 22, 2011, one week after the inspection and reopening of the crossing, the decedents were in the backseat of a Mini Cooper traveling southbound on State Route 24. As the car traversed the southern tie-in of the crossing, the driver lost control, and the car veered off the road and into a tree, killing the decedents.

The plaintiffs filed this wrongful death action, alleging that the defendants, as a result of their negligence and wrongful acts, created and permitted "a dangerous and hazardous condition . . . that resulted in the death of [the decedents]" and that the

> [d]efendants were negligent in failing to provide any warnings, through safety signage and/or devices, alerting the motoring public . . . that the defective ramp-like formation of the paving patch tie-in on the north and south side of the [r]ailroad [c]rossing was an extremely dangerous road hazard and required caution upon approaching and traversing the . . . [c]rossing.

---

[4] GDOT and CSX did not enter into a separate contract for the additional work, nor was there a specific time period contemplated to complete the work.

The plaintiffs also alleged that the "[d]efendants are jointly and severally liable for each other's negligent acts and omissions" because they "were acting in a joint enterprise and/or joint venture and exercised mutual control over the repair and maintenance work performed at the . . . [c]rossing. . . ."

The defendants filed multiple motions in the trial court, including motions for summary judgment, a motion to dismiss, and motions to exclude expert witnesses. The trial court entered the following orders: (1) an order denying GDOT's motion for summary judgment based on ownership of the crossing, breach of duty, and causation; (2) an order denying GDOT's motion to dismiss based on sovereign immunity, but granting the motion as to the theory of a joint venture; (3) an order denying GDOT's motion to dismiss based on the plaintiffs' failure to file an expert affidavit; (4) an order denying GDOT's motion to exclude the expert testimony of three of the plaintiffs' experts; (5) an order denying CSX's motion for summary judgment; (6) and order denying C&H's motion for summary judgment based on the acceptance doctrine; and (6) an order denying in part and granting in part C&H's motion to exclude the testimony of two of the plaintiffs' experts. These interlocutory appeals followed.

*Case No. A19A0361*

6

1. *Sovereign immunity.* GDOT contends that the trial court erred by denying its motion to dismiss based on sovereign immunity under OCGA § 9-11-12 (b) (1). We disagree.

"We review de novo a trial court's denial of a motion to dismiss based on sovereign immunity grounds, which is a matter of law. However, factual findings by the trial court in support of its legal decision are sustained if there is evidence authorizing them."[5]

Pursuant to the Georgia Constitution of 1983, "sovereign immunity extends to the [S]tate and all of its departments and agencies. The sovereign immunity of the [S]tate and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver."[6] Generally, the Georgia Tort Claims Act ("GTCA") waives the sovereign immunity of the State and its departments for "the torts of [S]tate officers and employees acting within the scope of their official duties or

---

[5] (Punctuation omitted.) *Dept. of Transp. v. Kovalcik*, 328 Ga. App. 185, 186 (761 SE2d 584) (2014).

[6] Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e).

7

employment," subject to certain exceptions.[7] GDOT contends that the inspection powers/functions, licensing powers/function, and design/plan exceptions apply in this case.[8]

(a) *GDOT's liability with regard to its contractors.* The trial court concluded that GDOT "is not liable for the actions of contractors." The court also concluded, however, that GDOT could be held liable for "its own actions in allowing road traffic [while] knowing of a defective condition," citing *Ga. Dept. of Transp. v. Kovalcik.*[9] In *Kovalcik*, this Court concluded that "the presence of contractors performing services on behalf of [GDOT] does not relieve [GDOT] from potential liability for its own actions."[10]

GDOT maintains that *Kovalcik* is inapposite because in that case, it was undisputed that GDOT owned the roadway at issue,[11] while here, GDOT does not own the crossing or the railroad right-of-way that the decedents traversed before their

---

[7] OCGA § 50-21-23 (a).

[8] See OCGA § 50-21-24 (8), (9), (10).

[9] 328 Ga. App. 185.

[10] Id. at 191 (2).

[11] See id. at 188 (1) (a).

8

accident. The question of who holds the deed to a roadway has not been treated as a relevant consideration when determining whether GDOT has authority over that road. Instead, the pivotal question is whether the road is part of the State highway system.[12] Here, it is undisputed that the road in question — State Route 24 — is identified by statute as part of the State highway system.[13] Thus, this argument is without merit.

(b) *Licensing powers/function exception.* The licensing exception provides that "[t]he [S]tate shall have no liability for losses resulting from . . . [l]icensing powers or functions, including, but not limited to, the issuance, denial, suspension, or revocation of or the failure or refusal to issue, deny, suspend, or revoke any permit, license, certificate, approval, order, or similar authorization."[14] "[T]his exception, by its plain terms, is not strictly limited to decisions related to permits or licenses.

---

[12] See *Dept. of Transp. v. Carr*, 254 Ga. App. 781, 783-787 (1) (564 SE2d 14) (2002) (physical precedent only), citing OCGA § 32-2-2 (a) (1) ("[GDOT] shall plan, designate, improve, manage, control, construct, and maintain a state highway system and shall have control of and responsibility for all construction, maintenance, or any other work upon the state highway system and all other work which may be designated to be done by [GDOT] by . . . law.").

[13] See OCGA § 32-4-22 (a) (7) (U. S. 441 is part of the State highway system).

[14] OCGA § 50-21-24 (9).

Instead, it also applies as to decisions relating to issuance, denial, suspension, or revocation of *approvals*."[15]

The licensing exception immunizes GDOT from certain potential claims, for example: pre-construction approval of a contractor's traffic control plan,[16] approval of construction plans,[17] approval of plans to use an interstate median to stockpile construction materials,[18] and permitting the construction of a wall near the intersection of a State highway.[19] It does not, however, provide immunity for liability for the plaintiffs' claims regarding GDOT's decision on whether and how to re-open the crossing after C&H completed its paving work.[20]

---

[15] (Emphasis in original.) *Ga. Dept. of Transp. v. Owens*, 330 Ga. App. 123, 137 (4) (b) (766 SE2d 569) (2014).

[16] See id. at 136-137 (4) (a).

[17] See *Kovalcik*, 328 Ga. App. at 190-191 (1) (b).

[18] See *Ga. Dept. of Transp. v. Jarvie*, 329 Ga. App. 681, 685 (766 SE2d 94) (2014), overruled on other grounds by *Rivera v. Washington*, 298 Ga. 770, 778, n.7 (784 SE2d 775) (2016).

[19] See *Ga. Dept. of Transp. v. Bishop*, 216 Ga. App. 57, 58 (1) (453 SE2d 478) (1994).

[20] See *Kovalcik*, 328 Ga. App. at 189 (1) (a).

(c) *Inspection powers/function exception*. The inspection exception provides that

> [t]he [S]tate shall have no liability for losses resulting from . . . [i]nspection powers or functions, including failure to make an inspection or making an inadequate or negligent inspection of any property *other than property owned by the [S]tate* to determine whether the property complies with or violates any law, regulation, code, or ordinance or contains a hazard to health or safety.[21]

But the plaintiffs are not alleging that GDOT negligently inspected the property. Instead, they contend that GDOT negligently re-opened the hazardous crossing, an action to which the inspection powers/function does not apply.[22]

(d) *Design/plan exception*. The design exception provides that

> "[t]he [S]tate shall have no liability for losses resulting from . . . [t]he plan or design for construction of or improvement to highways, roads, streets, bridges, or other public works where such plan or design is prepared in substantial compliance with generally accepted engineering or design standards in effect at the time of preparation of the plan or design."[23]

---

[21] (Emphasis supplied.) OCGA § 50-21-24 (8).

[22] See *Carr*, 254 Ga. App. at 787 (2) (physical precedent only).

[23] OCGA § 50-21-24 (10).

11

Here, again, the plaintiffs are not alleging that GDOT negligently designed the crossing. In fact, GDOT did not provide a plan or design for the paving of the crossing, and no GDOT employee approved the paving in advance. Thus, this exception is also inapplicable to the plaintiffs' claims against GDOT.

2. *Motion to dismiss for failure to comply with OCGA § 9-11-9.1.* Next, GDOT contends that the trial court erred by denying its motion to dismiss based on the plaintiffs' failure to file an expert affidavit. We disagree.

OCGA § 9-11-9.1 requires plaintiffs to attach to their complaint the affidavit of an expert in an action alleging professional malpractice by 25 categories of professionals.[24] But the plaintiffs do not allege that GDOT is liable for the actions or inactions of one of the categories listed or described in OCGA §§ 9-11-9.1 (g).[25] Instead, they allege that GDOT negligently made the decision to reopen the crossing

---

[24] See OCGA § 9-11-9.1 (g).

[25] No GDOT engineer was involved in this case until after litigation commenced. The fact that the plaintiffs' experts will testify about GDOT's failure to comply with professional engineering standards, which testimony is admissible as to whether GDOT met the standard of ordinary care and as to causation, does not transform this case into a professional negligence action. See, e.g., *DeKalb Medical Center, Inc. v. Hawkins*, 288 Ga. App. 840, 844 (1) (655 SE2d 823) (2007) (the need for expert testimony to prove causation "does not automatically transform [a] case into one for medical malpractice"), overruled on other grounds by *Harrison v. McAfee*, 338 Ga. App. 393, 396 (2), 402 (3) (788 SE2d 872) (2016).

12

when it remained in a dangerous condition following repairs. Thus, no expert affidavit was required to be filed with the plaintiffs' complaint.[26]

3. *Summary judgment based on breach of duty and causation*. GDOT argues that the trial court erred by denying its motion for summary judgment because there is insufficient evidence of breach of duty and causation. We disagree.

GDOT argues that without an expert affidavit, there is no evidence that it breached a duty and no evidence of a causal connection between any breach and the plaintiffs' injuries. As we concluded in Division 2, however, the plaintiffs were not required to file an expert affidavit. Therefore, this argument is meritless.

4. *Motion to exclude three of the plaintiffs' experts*. GDOT also argues that the trial court abused its discretion by denying its motion to exclude the testimony of three of the plaintiffs' experts: Sean Alexander, Ruston M. Hunt, and David Joe Lydick. We find no basis for reversal.

---

[26] See *Petree v. Ga. Dept. of Transp.*, 340 Ga. App. 694, 700 (2) (798 SE2d 482) (2017) (physical precedent only) (the plaintiff was not required to submit an expert affidavit to support her claim for ordinary negligence based on GDOT's maintenance of a drainage ditch); *Drawdy v. Ga. Dept. of Transp.*, 228 Ga. App. 338, 339 (491 SE2d 521) (1997) (physical precedent only) (Because the plaintiff "is alleging claims only for ordinary negligence in repair and maintenance of the roadway, an affidavit of an expert pursuant to OCGA § 9-11-9.1 is not necessary.").

First, GDOT argues that the testimony of those experts should have been excluded because they are not licensed professional engineers as required by OCGA § 24-7-702 (c) (1). But OCGA § 24-7-702 (c) (1) applies to expert testimony only "in professional malpractice actions" and only on "the acceptable standard of conduct of the professional" who allegedly committed malpractice. As we held in Division 2, this is not a professional negligence action. Thus, OCGA § 24-7-702 (c) does not apply, and the plaintiffs were not required to establish that their experts met the requirements of that Code section.[27]

We also reject GDOT's argument that even if the plaintiffs' claims sound in ordinary negligence, the trial court abused its discretion in admitting the testimony of the three listed experts because "expert testimony is neither needed nor appropriate in claims for ordinary negligence." "In Georgia, properly qualified expert witnesses may render an opinion on any matter within their realm of expertise, so long as it is based upon conclusions drawn by the expert that the jury

---

[27] See *Blake v. KES, Inc.*, 336 Ga. App. 43, 50-51 (783 SE2d 432) (2016) (because the plaintiffs did not allege claims for medical malpractice, they "were not required to establish that [their expert] met the requirements of OCGA § 24-7-702 (c) (2) (D), which apply only to medical malpractice actions, in order to testify as an expert as to causation").

14

could not ordinarily determine for themselves."[28] And it is well-settled that expert

testimony is admissible to establish causation, even in cases of ordinary or simple

negligence.[29]

*Case No. A19A0362*

5. *Acceptance doctrine.* C&H contends that the trial court erred by denying its

motion for summary judgment because the "acceptance doctrine" bars the plaintiffs'

claims against C&H, and no exception to the doctrine applies. We find no error.

The acceptance doctrine provides, generally, that if

> a contractor who does not hold itself out as an expert in the design work
> such as that involved in the controversy, performs its work without
> negligence, and the work is approved and accepted by the owner or the
> one who contracted for the work on the owner's behalf, the contractor

---

[28] (Citation and punctuation omitted.) *Layfield v. Dept. of Transp.*, 280 Ga. 848, 849 (1) (632 SE2d 135) (2006), quoting *Johnson v. Knebel*, 267 Ga. 853, 855 (1) (485 SE2d 451) (1997).

[29] See, e.g., *Cowart v. Widener*, 287 Ga. 622 (697 SE2d 779) (2010) (holding that although expert evidence typically is not required to prove causation in a simple negligence case, "expert evidence is required where a 'medical question' involving truly specialized medical knowledge (rather than the sort of medical knowledge that is within common understanding and experience) is needed to establish [causation].") (citation and emphasis omitted); *Layfield*, 280 Ga. App. at 848-849 (1).

15

is not liable for injuries resulting from the defective design of the work.[30]

There are well-established exceptions to this doctrine, however, including [cases in which] a subcontractor's work is "so negligently defective as to be imminently dangerous to third persons."[31] In *Hollis & Spann, Inc. v. Hopkins*, a concrete company built a handicap access ramp pursuant to specifications provided by the property owner, a hotel.[32] Although the hotel accepted the access ramp and a city inspector approved it, this Court determined that the concrete company was nevertheless potentially liable because the ramp did not comply with applicable regulations, and its defects caused injury to an elderly woman, who was a member of the class those regulations are designed to protect.[33]

Here, pretermitting whether CSX accepted C&H's paving work, there is evidence in the record that the slope over the tie-ins violated applicable standards.

---

[30] *Bragg v. Oxford Constr. Co.*, 285 Ga. 98, 99, n. 1 (674 SE2d 268) (2009).

[31] (Punctuation omitted.) *Hollis & Spann, Inc. v. Hopkins*, 301 Ga. App. 29, 32 (686 SE2d 817) (2009).

[32] See id. at 30.

[33] See id. at 33-34 (2).

The road sloped approximately five inches over a distance of four feet, while the plaintiffs introduced evidence that applicable standards require a slope of no more than three inches over thirty feet. A jury could, therefore, determine that the slope was so defective that it was imminently dangerous to individuals driving through the intersection.[34] Furthermore, although C&H contends that it merely poured asphalt where CSX directed and emphasizes that neither CSX nor GDOT provided any regulations or guidelines as to how the work must be performed, there is some evidence that it was C&H who determined the crucial element in this case: CSX's roadmaster testified that it was C&H that decided how long the tie-ins would be, and the length of the tie-ins is what determined the slope. Under these circumstances, the trial court did not err by denying summary judgment to C&H on its claim that the acceptance doctrine bars the plaintiffs' claims.

*Case No. A19A0364*

6. *Joint venture*. The plaintiffs contend that the trial court erred by granting partial summary judgment to CSX on the issue of liability for a joint venture, arguing that CSX and GDOT were engaged in a joint enterprise based on their common

---

[34] See id.

control of the intersection, their common purpose, their sharing of expenses, and their interchangeable roles in performing the work. We find no error in the trial court's ruling.

The Supreme Court of Georgia has explained that "[t]he theory of joint venturers arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other."[35] "Without the element of mutual control, no joint venture can exist."[36] "For a joint venture to exist, there must be not only a joint interest in the purpose of the enterprise but also an equal right, express or implied, to direct and control the conduct of one another in the activity causing the injury. . . ."[37]

---

[35] *Kissun v. Humana, Inc.*, 267 Ga. 419, 420 (479 SE2d 751) (1997).

[36] *Rossi v. Oxley*, 269 Ga. 82, 83 (1) (495 SE2d 39) (1998), citing *Holland v. Boyett*, 212 Ga. 458 (1) (93 SE2d 662) (1956).

[37] (Punctuation omitted.) *Williams v. Chick-fil-A, Inc.*, 274 Ga. App. 169, 170 (617 SE2d 153) (2005), quoting *Cullen v. Timm*, 184 Ga. App. 80, 82 (1) (360 SE2d 745) (1987).

The plaintiffs cite to two Court of Appeals cases — *City of Eatonton v. Few*[38] and *DeKalb County v. Lenowitz*,[39] — for the proposition that a joint venture does not require an undertaking for profit and with mutual control. Both of those cases, however, involved joint ventures between governmental bodies concerning jointly managed public works or services, exceptions to the rule which are not applicable in this case.[40]

Here, the trial court properly concluded that there is no evidence of mutual control between GDOT and CSX. The contract between the two parties allocated responsibilities between them, including requiring CSX "to complete the installation" of the panels. The plaintiffs' claims in this case are based upon the decision regarding when and how to reopen the roadway after the paving work was completed. And with regard to traffic control, signage, and warning, the agreement required GDOT to "provide traffic control and detour signing during the installation of the prefabricated concrete crossing system" and CSX "to provide flagging for all rail traffic." There is

---

[38] 189 Ga. App. 687 (377 SE2d 504) (1988).

[39] 218 Ga. App. 884 (463 SE2d 539) (1995).

[40] See *Lafontaine v. Alexander*, 343 Ga. App. 672, 681 (6) (808 SE2d 50) (2017).

no evidence that either party had the right to direct and control the conduct of the other party's employees.

Under these circumstances, the trial court properly concluded that GDOT and CSX were not engaged in a joint enterprise such that they are both liable for the negligence of the other.[41] Therefore, the trial court did not err by granting partial summary judgment to CSX on the issue of liability for a joint enterprise.

*Case No. A19A0363*

7. *Plaintiffs' claims for inadequate signage and the decision to reopen the roadway.* CSX argues that the trial court erred by denying its motion for summary judgment on the plaintiffs' claims based on inadequate signage at the railroad crossing and the decision to reopen the roadway.[42] We agree.

CSX argues that under Georgia law, GDOT was solely responsible for opening the roadway and for installing signage at the crossing. OCGA § 32-6-50 (b) provides:

> In conformity with its uniform regulations, [GDOT] shall place and maintain, or cause to be placed and maintained, such traffic-control devices upon the public roads of the [S]tate highway system as it shall

---

[41] See *Rossi*, 269 Ga. at 82-83 (1); *Williams*, 274 Ga. App. at 172.

[42] The trial court denied CSX's summary judgment motion as to other claims not challenged in this appeal.

20

deem necessary to regulate, warn, or guide traffic, except that [GDOT] shall place and maintain a sign for each railroad crossing at grade on the state highway system, warning motorists of such crossing, provided that each railroad company shall also erect and maintain a railroad crossbuck sign on its right of way at every such crossing. [GDOT] may remove or direct removal of all traffic-control devices and signs which are erected on the state highway system by any governing authority without the permission of [GDOT].

OCGA § 32-6-200 (a) provides:

Whenever, in the judgment of [GDOT] in respect to the [S]tate highway system, a county in respect to its county road system, or a municipality in respect to its municipal street system, such protection is reasonably necessary for the safety of the traveling public, [GDOT] or the county or the municipality may order the protection of a grade crossing by the installation of protective devices. Prompt notice of such order shall be given to the railroad or railroads involved; and within 30 days thereafter the representatives of [GDOT], the county, or the municipality and of the railroad or railroads involved shall meet and, within 90 days, agree to a plan and specifications for the acquisition and installation of protective devices. If an agreement is not reached within 90 days, [GDOT], the county, or the municipality may order the railroad company or companies involved to proceed with the acquisition and installation of protective devices, as indicated in the plan and specifications accompanying its order. However, no work leading to the installation of protective devices at a grade crossing on a county or municipal public road system shall commence until and unless the plan and specifications

21

for such device are approved by [GDOT]. It shall be the duty of the railroad or railroads to proceed with acquisition and installation of protective devices within 60 days after receipt of an order to that effect and to complete such acquisition and installation within six months thereafter.

Furthermore, the contract between CSX and GDOT plainly allocated to GDOT responsibility for providing "traffic control and detour signing during the installation of the prefabricated crossing system."

Thus, "[b]ecause it was [G]DOT's responsibility to designate the location for, and the manner of placement of, the traffic control devices" and signage, the trial court erred by denying summary judgment to CSX on the plaintiffs' claims regarding traffic signage and control and the decision on when and how to reopen the roadway.[43]

---

[43] See *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 349 (2) (c) (568 SE2d 559) (2002). The trial court concluded that "[because] the claimed road hazard was created by CSX and its subcontractor, it owed a duty to mitigate or warn of the potential danger of same," citing *Comanche Constr., Inc. v. Ga. Dept. of Transp.*, 272 Ga. App. 766 (613 SE2d 158) (2005) (physical precedent only). In *Comanche*, we affirmed the denial of a construction company's summary judgment motion because as opposed to in the instant case, the contract between the construction company and GDOT delegated to the construction company responsibility for designing and preparing the traffic control plan for the bridge repair at issue, including placement and removal of signs and reopening the road, subject to approval by DOT, and for designating a "'Work Site Traffic Supervisor' . . . 'responsible for initiating, installing

8. *Motion to exclude two of the plaintiffs' experts*. CSX contends that the trial court erred by admitting the testimony of two of the plaintiffs' experts.

OCGA § 24-7-702 (b), which governs the admissibility of expert testimony in Georgia, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case[,] which have been or will be admitted into evidence before the trier of fact.

> Whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion. In determining the admissibility of expert testimony, the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony.[44]

and maintaining all traffic control devices.'" Id. at 766. Thus, *Comanche* is inopposite.

[44] (Punctuation omitted.) *Toyo Tire North America Mfg., Inc.v. Davis*, 299 Ga. 155, 160 (2) (787 SE2d 171) (2016), quoting *HNTB Ga., Inc. v. Hamilton-King*, 287

(a) *Sean Alexander*. CSX moved to exclude the testimony of Officer Sean Alexander, the plaintiffs' reconstruction expert, arguing that his opinion in a 2016 deposition "did not change despite highly relevant corrections to the factual assumptions underlying his [prior 2015] deposition" regarding the slope of the crossing. When the error was brought to his attention, Alexander conceded that the correction changed his opinion regarding whether the car in which the decedents were traveling would have "bottomed out" if it had been traveling at a lower speed, but it did not change his opinion about whether the car bottomed out at its speed at the time of the accident. And that opinion was based on Alexander's analysis of evidence including engineering scans, the markings on and damage to the undercarriage of the car, gouges in the asphalt, and his estimation of the car's speed at the time of the accident.

Under these circumstances, CSX's challenge goes to the weight and credibility of Alexander's opinion and not its admissibility; therefore the trial court did not abuse its discretion by denying CSX's motion to exclude his testimony.[45]

Ga. 641, 642-643 (697 SE2d 770) (2010).

[45] See *United States v. Barton*, 909 F3d 1323, 1333 (III) (B) (11th Cir. 2018).

24

(b) *Ruston Hunt*. CSX also moved to exclude Hunt's testimony. The plaintiffs called Hunt, a human factors engineer, to rebut the testimony of defense experts who performed an accident reconstruction, purportedly to rebut the testimony of Alexander, the plaintiffs' expert who opined that the car in which the decedents were traveling bottomed out when traversing the tracks. According to the plaintiffs, Hunt was retained not to reconstruct the wreck itself, but to show that the reconstruction methodology was flawed.

On appeal, CSX asserts three challenges to Hunt's testimony. First, CSX argues that because Hunt is a human factors engineer and not an accident reconstructionist, he was not qualified to offer opinions about the soundness of the reconstruction. We disagree. Hunt is an industrial and mechanical engineer and expert in systems engineering with specific expertise in human factors engineering, and he has studied and evaluated factors that affect human beings, including drivers. The trial court did not abuse its discretion in concluding that he was qualified to offer his opinion that the reconstruction differed from the conditions that the driver of the car in this

25

accident experienced because the test drivers knew and expected the bump in the roadway.[46]

Next, CSX argues that Hunt's testimony is irrelevant because the experts he was called to rebut merely were refuting Alexander's conclusion that the vehicle bottomed out while traversing the crossing. This argument is meritless. Hunt's opinion regarding the conditions and methodology of the reconstruction are relevant to rebut the testimony of the experts who conducted the reconstruction.[47]

Third, CSX contends that Hunt's testimony was inadmissible because he offered no analysis for his opinions, and his opinions are not the product of reliable principles and methods. But as we previously have concluded, we find no abuse of discretion in the trial court's conclusion that Hunt was qualified to offer an opinion challenging the methodology of the reconstruction.

---

[46] See *Ga. Dept. of Transp. v. Owens*, 330 Ga. App. 123, 128 (1) (a) (766 SE2d 569) (2014) (concluding that Ruston Hunt, the same expert CSX challenges in this case, "has considerable credentials with respect to the research, study[,] and application of human factors engineering, and the trial court was authorized to conclude that he is qualified to render opinions with respect to issues such as driver expectation and [the driver's] ability to perceive [an object].")

[47] See, e.g., *Southern States Cooperative, Inc. v. Melic Aquafeeds, Inc.*, 701 FSupp2d 1348, 1361 (III) (B) (1) (M.D. Ga. 2010).

*Judgment affirmed in Case Nos. A19A0361, A19A0362, and A19A0364. Judgment affirmed in part and reversed in part in Case No. A19A0363. Coomer and Markle, JJ., concur.*