**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 2, 2016**

# In the Court of Appeals of Georgia

A15A2207. BLAKE et al. v. KES, INC. et al.                    DO-108

DOYLE, Chief Judge.

This is the second appearance before this Court of this case, which arises from a tort claim by plaintiffs Carl and Yvonne Blake (collectively, "the plaintiffs") following the death of their son in a day habilitation facility. In our previous opinion, we vacated the grant of summary judgment to defendants, KES, Inc., Sandra and Kenneth Browner, Mable Sempler, and Nicole Wise (collectively, "KES") and remanded with direction that the trial court consider a specific expert deposition and certain exhibits in deciding the summary judgment motion.[1] Upon remand, after reconsideration of the motion, including those documents, the trial court again

---

[1] See *Blake v. KES, Inc.*, 329 Ga. App. 742 (766 SE2d 138) (2014).

granted summary judgment to KES. The plaintiffs appeal, and for the reasons that follow, we vacate the trial court's order and remand.

In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[2]

As set forth in our previous opinion, the facts in this case, so viewed

show that Paul Blake was an adult diagnosed with several developmental disabilities from birth, including organic personality disorder, moderate intellectual disability, and partial complex seizures. By 2005, Paul resided with caretakers at a personal care home and generally spent his days at a KES day habilitation facility, where he received services pursuant to a contract between KES and his parents. In addition to his seizures, Paul had a history of leaving his assigned

---

[2] (Citation omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

area without notice or permission, and he needed constant line-of-sight supervision, in addition to daily medication.

On September 22, 2009, Paul arrived at the KES facility at approximately 9:00 a.m. and complained of dizziness and feeling poorly. Paul's immediate care giver allowed him to rest without joining other activities. Around noon, while Paul was finishing his lunch, he asked if he could return to his assigned task of cleaning a computer desk, but he was asked to stay at the lunch table so he could finish eating and continue to rest. When the care giver was out of the room, Paul left the classroom and walked out of the building. Paul was not immediately followed, but staff began tracing his path thereafter.

At approximately 12:19 p.m., security camera footage shows that as Paul walked alongside a van parked at the side of the building, he faltered, leaned into the side of the van, and fell forward down to the ground. Approximately 22 seconds later, a KES worker arrived at Paul's body, and despite the worker's prompting, Paul remained unresponsive. Approximately 40 seconds later another worker, Mabel Semper, arrived and called into the building to advise the staff that they had located Paul. She had to make two calls to reach someone, and in the minutes that followed, Semper called 911 and remained on the line with the operator. During this time, a third employee, Kenneth Browner, arrived and checked Paul's mouth for foreign objects, and Paul was observed to be breathing with a faint pulse. Other employees arrived and they repositioned Paul to aid in his breathing, and they began CPR chest compressions as instructed by the 911 operator over speakerphone.

3

There was a several minute time gap between Paul's fall and the administration of CPR. Emergency personnel arrived minutes later, took over emergency care, and prepared him for transport. Treatment continued en route and at the hospital, but Paul was pronounced dead at the hospital soon thereafter. The cause of death listed by the emergency room physician was "cardiac arrest status post likely seizure."

Based on Paul's death, the Blakes sued KES, alleging claims for negligence, negligence per se, wrongful death, intentional infliction of emotional distress, breach of contract, and negligent supervision and training. KES answered, discovery ensued, and both parties moved for summary judgment. Following a hearing, the trial court granted summary judgment to KES and denied the Blakes' motion. The trial court based its ruling, in part, on the exclusion of certain unauthenticated documents and depositions not filed 30 days before the hearing.[3]

The plaintiffs appealed, arguing in part that the trial court erred by failing to consider an unsigned copy of the deposition of their expert, Dr. Anthony Kimani,[4] and certain exhibits.[5] This Court vacated the grant of summary judgment to KES and

[3] *Blake*, 329 Ga. App. at 743-744.

[4] See id. at 744 (1) (a).

[5] Id. at 746 (1) (b).

4

remanded the case with direction that the trial court consider the deposition of Dr. Kimani and the aforementioned exhibits.[6]

Following remand, upon reconsideration of KES's motion for summary judgment, including Dr. Kimani's deposition and the plaintiffs' exhibits, the trial court again granted summary judgment to KES on all claims. In so doing, the trial court concluded that there was no evidence in the record "sufficient to create a dispute that any action or inaction undertaken by [KES] *before* [Paul's] collapse on September 22, 2009[,] caused his subsequent seizure or cardiac arrest, which was determined to be his cause of death."[7] The court also concluded that there was insufficient evidence to support the plaintiffs' claim that KES's failure to promptly administer CPR to Paul was a proximate cause of his death. In reaching the latter conclusion, the trial court found that although Dr. Kimani's deposition testimony created a material issue of fact as to causation for wrongful death based on KES's

---

[6] See id. at 745-746 (1) (a), (b). This Court also affirmed the denial of the plaintiffs' motion for summary judgment. See id. at 746 (2).

[7] (Punctuation omitted; emphasis in original.) We agree that there is no evidence in the record that any conduct on the part of KES caused Paul's seizure or cardiac arrest.

5

failure to render aid, he was not competent to testify as an expert as a matter of law, and the trial court therefore disregarded his testimony. This appeal followed.

The plaintiffs contend that the trial court erred by granting summary judgment to KES on the basis that there was insufficient evidence to support their claim that KES's failure to promptly administer CPR to Paul was a proximate cause of his death, arguing in part that the trial court erred by again excluding the deposition testimony of Dr. Kimani.

Dr. Kimani testified at his deposition that KES failed to timely provide CPR to Paul and that had they done so, Paul's "chance of a successful resuscitation was at least 50 percent." The trial court concluded that this testimony "creates a material issue of fact as to causation for wrongful death for failure to render aid under *Cowart*,[8] thereby precluding summary judgment for [KES]. . . ." The trial court, however, disregarded Dr. Kimani's testimony because he was not competent to testify as an expert pursuant to OCGA § 24-7-702 (c) (2) (D) (formerly OCGA § 24-9-67.1).

As the plaintiffs point out, KES did not challenge Dr. Kimani's qualification to testify as an expert in this case. Instead, the trial court sua sponte determined that he did not meet the requirements of OCGA § 24-7-702 (c) (2) (D). Pretermitting

---

[8] *Cowart v. Widener*, 287 Ga. 622 (697 SE2d 779) (2010).

6

whether the trial court erred by excluding his testimony in the absence of such a challenge,[9] we conclude that the trial court erred by finding that Dr. Kimani had to meet the requirements of that Code section in order to testify as an expert in this case.

"We review a trial court's decision concerning an expert's qualifications under [OCGA § 24-7-702 and] OCGA § 24-9-67.1 for an abuse of discretion."[10] Nevertheless, "in all appeals involving the construction of statutes, our review is conducted under a de novo standard."[11]

Because this case concerns the meaning [and application] of [OCGA § 24-7-702] (c) (2) ([D]), we begin with the familiar and settled principles

---

[9] Certainly, trial judges are assigned a gatekeeping role with regard to expert testimony. See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579, 589 (II) (B) (113 SCt 2786, 125 LE2d 469) (1993); *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). Nevertheless, "the proffering party bears the burden of presenting evidence of reliability in order to meet the standards of OCGA § 24-9-67.1." *HNTB Georgia, Inc. v. Hamilton-King*, 287 Ga. 641, 646 (2) (697 SE2d 770) (2010). In this case, in the absence of a challenge to Dr. Kimani's qualifications, the plaintiffs were not placed on notice that they needed to present such evidence before the trial court ruled, and they were denied the opportunity to request a hearing on this issue. See OCGA § 24-7-702 (d) "Upon motion of a party, the court may hold a pretrial hearing to determine whether the witness qualifies as an expert and whether the expert's testimony satisfies the requirements of subsections (a) and (b) of this Code section. Such hearing and ruling shall be completed no later than the final pretrial conference contemplated under Code Section 9-11-16."

[10] *Hope v. Kranc*, 304 Ga. App. 367, 370 (1) (696 SE2d 128) (2010).

[11] *Hinkle v. Postel*, 293 Ga. 692, 693 (749 SE2d 726) (2013).

that govern our consideration of the meaning of a statute. A statute draws its meaning, of course, from its text. When we read the statutory text, we must presume that the General Assembly meant what it said and said what it meant, and so, we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. The common and customary usages of the words are important, but so is their context. For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law – constitutional, statutory, and common law alike – that forms the legal background of the statutory provision in question.[12]

OCGA § 24-7-702 governs the admissibility of opinion testimony by expert witnesses in civil actions. The standard for the admissibility of such testimony is found in subsection (b):

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of

---

[12] (Citations and punctuation omitted.) *Dubois*, 297 Ga. at 579 (2).

8

the case which have been or will be admitted into evidence before the trier of fact.[13]

Subsection (c) addresses the requirements for expert witnesses in professional malpractice actions:

> Notwithstanding the provisions of subsection (b) of this Code section and any other provision of law which might be construed to the contrary, in *professional malpractice actions*, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>
> (1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and
>
> (2) *In the case of a medical malpractice action*, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:
>
>> (A) The active practice of such area of specialty of his or her
>>
>> profession for at least three of the last five years, with sufficient

---

[13] OCGA § 24-7-702 (b).

9

frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; and

(C) Except as provided in subparagraph (D) of this paragraph:

(i) Is a member of the same profession;

(ii) Is a medical doctor testifying as to the standard of care of a

defendant who is a doctor of osteopathy; or

(iii) Is a doctor of osteopathy testifying as to the standard of care of a defendant who is a medical doctor; and

(D) Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider. However, a nurse, nurse practitioner, certified registered nurse anesthetist, nurse midwife, physician assistant, physical therapist, occupational therapist, or medical support staff shall not be competent to testify as to the standard of care of a physician.[14]

Based upon its reading of Dr. Kimani's deposition transcript and curriculum vitae, the trial court found that he was not qualified to testify as an expert in this case because the record "affirmatively reflect[ed] that Dr. Kimani *did not*, for three of the five years immediately preceding [Paul's] collapse in September 2009 supervise, teach, or instruct medical support staff such as [individual defendants Semper and

---

[14] (Emphasis supplied.) OCGA § 24-7-702 (c).

11

Browner]" as required by OCGA § 24-7-702 (c) (2) (D).[15] But, "OCGA § [24-7-702] (c) (2) by its plain terms applies only in cases of alleged medical malpractice."[16]

> OCGA § 9-3-70 defines "the term 'action for medical malpractice'" as

> any claim for damages resulting from the death of or injury to any person arising out of: (1) [h]ealth, medical, dental, or surgical service, diagnosis, prescription, treatment, or care rendered by a person authorized by law to perform such service or by any person acting under the supervision and control of the lawfully authorized person; or (2) [c]are or service rendered by any public or private hospital, nursing home, clinic, hospital authority, facility, or institution, or by any officer, agent, or employee thereof acting within the scope of his employment.

However,

> [n]ot all injuries that occur in a hospital, nursing home or other health care facility are the result of professional negligence; they may be solely attributable to ordinary or simple negligence. For that reason, our appellate courts have consistently looked to the claim stated rather than the entity or person sued when determining whether an action is for

---

[15] (Punctuation omitted; emphasis in original.) The record does establish that Dr. Kimani was board-certified in internal medicine, with a specialty in pulmonary and critical care medicine, and he was certified in cardiac life support. He was the medical director of the respiratory therapy department of the Emory University geriatric center from 1994 through 1998, and he was in private practice from 1999 through the time of his 2013 deposition.

[16] *Wilson v. McNeely*, 307 Ga. App. 876, 879 (2) (705 SE2d 874) (2011).

professional malpractice or ordinary negligence. Simply because an alleged injury occurs in a hospital setting, a suit to recover for that injury is not necessarily a medical malpractice action. Likewise, not every suit which calls into question the conduct of one who happens to be a medical professional is a medical malpractice action. A professional malpractice action is merely a professional negligence action and calls into question *the conduct of a professional in his area of expertise.*" Consequently, we must look to the substance of an action against a medical professional, hospital, or health care facility in determining whether the action is one for professional or simple negligence.[17]

In this case, the plaintiffs do not allege medical malpractice, instead asserting claims for simple negligence and negligence per se, in addition to wrongful death, intentional infliction of emotional distress, breach of contract, and negligent supervision and training. Indeed, KES concedes on appeal that "this case is not a medical malpractice action." And the record shows that the facility where Paul collapsed is a day facility that provides "education, life skills, job assistan[ce,] and rehabilitation services to people with mental and physical disabilities." The individual defendants listed in this case were non-medical personnel and personal care givers.

---

[17] (Citations and punctuation omitted; emphasis in original.) *Moore v. Louis Smith Mem. Hosp.*, 216 Ga. App. 299, 299-300 (454 SE2d 190) (1995).

13

Under these particular circumstances, the plaintiffs were not required to establish that Dr. Kimani met the requirements of OCGA § 24-7-702 (c) (2) (D), which apply only to medical malpractice actions, in order to testify as an expert as to causation in this case. Accordingly, the trial court erred by excluding Dr. Kimani's testimony on this basis.

Therefore, we vacate the order granting summary judgment and remand for the trial court to consider the merits of KES's summary judgment motion.[18]

*Judgment vacated and remanded. Phipps, P. J., and Boggs, J., concur.*

---

[18] Although the trial court already has determined that Dr. Kimani's deposition testimony created a material issue of fact as to causation for wrongful death based on KES's failure to timely render aid, it has not, to date, ruled upon the multiple remaining bases for summary judgment as alleged by KES. Although we are mindful of the delay a remand will cause in this litigation, we decline to review rulings not made by the trial court in this case. See *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (upon appellate determination that the trial court relied on an erroneous legal theory or reasoning in reviewing an order on summary judgment involving "a variety of grounds advanced," the appellate court may remand the case to the trial court "to issue rulings on grounds advanced, which could then serve as a basis for appellate review").