**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS***
***COURT. ALL FILINGS MUST BE SUBMITTED WITHIN***
***THE TIMES SET BY OUR COURT RULES.***

**May 6, 2021**

# In the Court of Appeals of Georgia

A21A0043. GENERAL MOTORS LLC v. BUCHANAN et al.

MERCIER, Judge.

In this wrongful death/product liability action, General Motors LLC ("GM") filed a motion for a protective order seeking to prevent the deposition of its CEO. The trial court denied the motion, and GM now appeals, asserting that the court's order violates OCGA § 9-11-26's prohibitions against abusive discovery practices. GM also urges this Court to apply the apex doctrine – a framework used by some courts to determine whether to permit the deposition of a high-ranking corporate executive.[1] For the following reasons, we affirm the trial's ruling and decline to apply the apex doctrine.

---

[1] See, e.g., *Smith v. City of Stockton*, 2017 U.S. Dist. LEXIS 44767, *3-4 (IV) (E.D. Cal. 2017).

The underlying facts are undisputed. In November 2014, Glenda Marie Buchanan ("Marie") was driving her 2007 Chevy Trailblazer when it veered off the roadway and landed in a ditch.[2] She died from injuries sustained in the wreck. In May 2016, Marie's husband Robert Buchanan, individually and as administrator of her estate, filed suit against GM alleging that it was liable for Marie's death because of a defect in the Trailblazer and GM's failure to warn of the defect.[3] Specifically, he alleged that the electronic stability control[4] or Stabilitrak system did not engage to "prevent the vehicle from losing control and leaving the road." Buchanan alleged that a component of the Stabilitrak system, the steering wheel angle sensor ("SWAS"),

---

[2] The Trailblazer was in part designed, manufactured, marketed and sold by General Motors Corp. ("Old GM"). Old GM declared bankruptcy in 2009, and its assets were sold to what became General Motors LLC ("New GM"). As part of the sale agreement, New GM assumed liabilities to third parties for death or personal injury caused by motor vehicles manufactured or sold by Old GM. See *Butler Wooten & Peak LLP v. GM LLC*, 943 F3d 125, 131-132 (II) (B) (2nd Cir. 2019). We will simply refer to New GM as GM for purposes of this opinion.

[3] Buchanan named a second defendant, but that party was later dismissed from the suit.

[4] Electronic stability control helps a driver maintain control of the vehicle when he or she oversteers or understeers by braking the appropriate wheel and in some cases by also reducing the engine power. It adds a control unit that monitors the steering wheel angle and vehicle rotation.

2

failed, disabling Stabilitrack. Buchanan also sought punitive damages for GM's "fail[ure] to warn of a known defect" in its Trailblazers.

During discovery, Buchanan's counsel sent GM a request to depose its CEO, Mary Barra.[5] The request noted that Barra "'led GM through a reckoning of its culture and safety practices'" as a result of litigation involving a different GM vehicle defect; had "worked in Global Product Development and Global Manufacturing Engineering, both of which doubtless dealt with vehicle engineering development and safety;" and created the Speak Up for Safety ("Speak Up") program to "engender a 'safety first' culture," fix problems rather than merely identify them, and encourage follow-up so that GM's safety group would be held accountable. Buchanan's counsel asserted that Barra was "the only person who can speak to the issue of why GM has not acted and why the [Speak Up] Program has failed to remedy the defects in the SWAS, a part known to be present in some 770,000 GM vehicles." Counsel cited to the deposition of a GM product investigator who testified that the "warranty [claim] rate" of the SWAS was about 10 percent and that GM had over 73,711 warranty claims through

---

[5] Barra became CEO of GM in January 2014. Prior to becoming CEO, she held various positions at GM and its predecessor beginning in 1980, including executive positions for GM beginning in 2008.

July 2018, but GM's internal investigation left the matter "to be determined" and it was recommended that the investigation be closed "with no field action."

GM moved for a protective order to prevent Barra from being deposed, asserting that Buchanan could obtain the information sought by deposing lower-level GM employees with personal knowledge of the alleged SWAS defect, and that his request to depose GM's highest ranking officer "is the very type of harassment, oppression, embarrassment, and undue burden and expense that OCGA § 9-11-26 (c) is designed to protect against." It also argued that both the apex doctrine and the application of OCGA § 9-11-26 (c) in Georgia's state and federal courts precluded the taking of Barra's deposition. Attached to the motion for a protective order was Barra's affidavit in which she averred that she was not involved in the design, development, or manufacture of the SWAS at issue, and has no direct, unique, specialized or superior knowledge about the SWAS in the 2006-2009 Trailblazers. Barra stated further that although the Speak Up program was implemented during her tenure as CEO, she did not conduct any Speak Up investigations and did not receive individual reports about each investigation.

After hearing argument from both counsel, the trial court concluded that Buchanan's attempt to depose Barra was a reasonably calculated attempt to discover

evidence that might be admissible at trial. The court pointed to Barra's public statements during recent litigation regarding a different alleged vehicle defect , and other statements Barra made concerning "GM's safety culture and efforts to investigate and eliminate safety issues[.]" The court found further that "there is no express or implied law in Georgia for the 'apex doctrine' or other framework that imposes presumptive hurdles to seeking discovery (or deposition testimony) from certain corporate individuals." The court concluded that GM did not show good cause for the issuance of the protective order and directed that the deposition of Barra "go forward at a mutually convenient date and time within forty-five (45) days of the date of this [o]rder, and the deposition shall be held in Detroit, Michigan. Excluding time spent on objections, the deposition is limited to 3 hours." We granted GM's application for interlocutory review, and this appeal followed.

Pursuant to OCGA § 9-11-26 (b) (1), parties to a lawsuit may "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]" However, OCGA § 9-11-26 (c) provides in relevant part that

[u]pon motion by a party or by the person from whom discovery is sought and for good cause shown, the court in which the action is pending or, alternatively, on matters relating to a deposition, the court in the county where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . (1) That the discovery not be had; [or] (2) That the discovery may be had only on specified terms and conditions, including a designation of the time or place[.]

The ruling on a motion for a protective order lies within the sound discretion of the trial court, and we will only reverse the court's decision when it has abused its discretion.[6] *Smith v. Northside Hosp.*, 347 Ga. App. 700, 703 (820 SE2d 758) (2018). "This is because a trial court has broad discretion to control all discovery matters. And as to protective orders, a trial court will only abuse its discretion when its ruling is unsupported by any evidence of record or when that ruling misstates or misapplies the relevant law." Id. (citations and punctuation omitted).

---

[6] GM asserts that de novo review is required because the trial court misapplied OCGA § 9-11-26. It is true that we review appeals involving the construction of a statute under the de novo standard. See *Blake v. KES*, 336 Ga. App. 43, 47 (783 SE2d 432) (2016). However, the construction of the statute is not at issue here, and the trial court only exercised its discretion to act under it.

6

1. GM argues that the trial court, in denying its motion for a protective order, violated OCGA § 9-11-26's prohibitions against abusive discovery practices. Citing *Tankersley v. Security Nat. Corp.*, 122 Ga. App. 129 (176 SE2d 274) (1970) and *Wheeling-Culligan v. Allen*, 243 Ga. App. 776 (533 SE2d 797) (2000), GM asserts that the trial court erred as a matter of law by failing to acknowledge factors such as whether Barra has unique knowledge of the issues in the case and whether that information could be obtained by other less-instrusive means.[7] Certainly the court *may* consider a myriad of factors to determine whether GM showed good cause to protect Barra from annoyance, embarrassment, oppression, or undue burden or expense. However, neither *Tankersley* nor *Wheeling-Culligan* stand for the proposition that the trial court *must* consider these factors when resolving a motion for a protective order.[8]

---

[7] These factors are what make up the apex doctrine, which we decline to apply here. See Div. 2.

[8] In *Tankersley*, this Court held, in one sentence and without any analysis, that the trial court did not err in quashing a defendant's request for admissions and notice to take the deposition of the president of a corporation because the information sought was already admitted or had already been secured by the use of interrogatories, and any other information could be secured by further interrogatories. Supra, 122 Ga. App. at 130 (1). And in *Wheeling-Culligan*, because the record did not contain interrogatories which were necessary for appellate review, we assumed the trial court's ruling quashing a deposition was supported by the evidence and affirmed.

Buchanan asserts that Barra's deposition testimony is reasonably calculated to lead to the discovery of admissible evidence to support his failure to warn and punitive damages claims.[9] In particular, he claims that the testimony will help explain why the SWAS remained a problem "To Be Determined" following twelve years after the first sale of the 2007 Trailblazers and tens of thousands of warranty claims. And the trial court ruled that Barra's public statements during recent litigation involving a different alleged vehicle defect, and her statements about GM's safety culture and efforts to investigate and eliminate safety issues, justify her deposition to discover evidence that might be admissible at trial.

The parties do not dispute that Barra made the following statements in April and July of 2014, months before Marie's accident. During a congressional investigation into a different alleged vehicle defect, Barra stated that she would stand with her new vice president of global vehicle safety to quickly identify and resolve

---

Supra, 243 Ga. App. at 777.

[9] GM argues that Buchanan's punitive damages claim is barred by a ruling of the bankruptcy court and based upon post-accident conduct. However, the trial court made no ruling on this issue, and OCGA § 9-11-26 (b) (1) provides that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

any product safety issues, and that she would review all future death inquires in GM vehicle crashes. In April 2014, Barra instituted the Speak Up program to encourage and recognize employees for contributing ideas to make GM vehicles safer, and for speaking up when they see something that could impact customer safety. GM asserts that these statements are irrelevant to Buchanan's claims because Barra was not involved in the Speak Up program at an operational or technical level and thus could not testify on how it functions on a day-to-day basis, and stated in her affidavit that she was not involved in the investigation of the SWAS in Marie's Trailblazer and had no knowledge of any issues relevant to this case.

"In the discovery context, courts should and ordinarily do interpret 'relevant' very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation." *Ewing v. Ewing*, 333 Ga. App. 766, 768 (1) (777 SE2d 56) (2015) (citation and punctuation omitted). Buchanan sought information concerning why GM had not remedied the alleged defect in the SWAS, which is relevant to its failure to warm and punitive damages claims. See, e.g., id. (evidence of alleged adultery relevant in divorce action). Further, the fact that Barra in her affidavit denied having knowledge of any issues relevant to this case does not demand that the protective order be granted, especially in light of her other statements. See *Bridges*

9

*v. 20th Century Travel*, 149 Ga. App. 837, 838 (256 SE2d 102) (1979) (contention that individual at issue for motion for protective order had no knowledge of subject matter of suit "must obviously yield to the overriding policy of liberally construing the application of the discovery law"). There was evidence here to support the trial court's conclusion that the information Buchanan seeks is relevant and appears reasonably calculated to lead to the discovery of admissible evidence. See OCGA § 9-11-26 (b) (1).

There was also evidence to support the trial court's conclusion that GM did not meet its burden of showing good cause for a protective order under OCGA § 9-11-26 (c). "What constitutes 'good cause' must be left largely to the trial judge who has a latitude of discretion in determining whether the showing has been made." *Harris v. Tenet Healthsystem Spalding*, 322 Ga. App. 894, 901 (3) (746 SE2d 618) (2013) (citations and punctuation omitted). GM argues only that the deposition would serve no other purpose than to harrass Barra and subject GM to undue burden and expense because high-ranking executives should not be compelled to testify unless they have unique knowledge of the issues and the information cannot be obtained by other means. As we have explained however, there is no authority requiring that these factors be satisfied in order to depose a high-ranking executive. And, even though

10

GM made no other showing that justice required Barra be protected from "annoyance, embarrassment, oppression, or undue burden or expense," the trial court exercised its discretion under OCGA § 9-11-26 (c) (2) to set "specified terms and conditions" for the deposition including that it be held in Detroit where Barra works and limited to three hours. See *Osborne v. Bank of Delight*, 173 Ga. App. 322, 324 (2) (326 SE2d 523) (1985) (potential for harassment or burden "may be minimized by the imposition of lesser restrictions than the complete foreclosure of the requested discovery").

"[T]he discovery procedure is to be construed liberally in favor of supplying a party with the facts," *Bowden v. Medical Center*, 297 Ga. 285, 291 (2) (a) (773 SE2d 692) (2015) (citations, punctuation, and emphasis omitted), and "it is only in rare cases, based on good cause shown, that the trial court may refuse a deposition altogether." *Osborne*, supra. "Protective orders . . . are intended to be protective – not prohibitive[.]" Id. (citations and punctuation omitted). Under the circumstances presented here, as there was evidence to support the trial court's ruling, we find no abuse of the court's discretion in denying GM's request for a protective order to prevent Barra's deposition.

2. GM and several amici urge this Court to apply the apex doctrine to prevent Barra's deposition.

11

Under the apex doctrine, an individual objecting to a deposition must first demonstrate he is sufficiently high-ranking to invoke the deposition privilege. Upon this showing, the court then considers whether there are "extraordinary circumstances" that justify deposing the high-ranking officials, based on (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case; and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods.

*Givens v. Newsome*, 2021 U.S. Dist. LEXIS 3135, *12 (B) (E.D. Cal. 2021) (citations and punctuation omitted); see *In re Tylenol*, 2014 U.S. Dist. LEXIS 89981, *7-8 (III) (b) (E.D. Pa. 2014). Some state courts and federal district courts, including district courts within the Eleventh Circuit, have applied the apex doctrine.[10] However, our state appellate courts have not applied the doctrine, and we decline to do so here. The apex doctrine is inconsistent with Georgia's discovery provisions that require a liberal construction in favor of supplying a party with facts, *Bowden*, supra, and that place

---

[10] See, e.g., *Reilly v. Chipotle Mexican Grill*, 2016 U.S. Dist. LEXIS 193407, *13-20 (II) (B) (2) (c) (S.D. Fla. 2016); *Dashtpeyma v. Liberty Ins. Corp.*, 2012 U.S. Dist. LEXIS 198514, *8-9 (IV) (C) (N.D. Ga. 2012). We have found no case from the Eleventh Circuit Court of Appeals applying the apex doctrine. Although GM cites to federal court of appeals cases that, it argues, apply the doctrine (without specifically referring to it by name), we have found only one that mentions the apex doctrine, and it holds that the lower court erred in relying upon it to grant a protective order. See *Serrano v. Cintas Corp.*, 699 F3d 884, 901-902 (II) (C) (3) (6th Cir. 2012).

the burden upon the party seeking a protective order to show cause for the order. See

OCGA § 9-11-26 (c); see also *BlueMountain Credit Alternatives Master Fund L.P.*

*v. Regal Entertainment Group*, 465 P3d 122, 131-132 (III) (B) (Colo. Ct. App. 2020)

(federal courts do not uniformly apply the apex doctrine, and a growing number of

states have rejected it; the apex doctrine shifts the burden to the party seeking the

corporate executive's deposition); *Crest Infiniti II, LP v. Swinton*, 174 P3d 996, 1003-

1004 (Okl. Sup. Ct. 2007) (declining to apply the apex doctrine because it shifts the

burden to the party seeking discovery).[11] The creation of an exception to the discovery rules for high-ranking executives is best left for the legislature.

*Judgment affirmed. Colvin, J., concurs. Dillard, P. J., concurs fully and specially.*

---

[11] GM asserts that Georgia courts often look to federal courts for guidance on discovery issues. While this is true, the apex doctrine clearly contradicts our statutory discovery provisions, there is almost no application of the doctrine beyond federal district courts, and in those courts it is not applied in a consistent manner. Further, the reason we often look to federal courts for guidance on discovery issues is because Georgia's Civil Practice Act discovery provisions generally conform very closely to the federal provisions. See *Bowden*, supra at 291 n.5. However, Georgia's provision governing the scope of discovery is broader than the federal rule. OCGA § 9-11-26 (b) (1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," while Fed. R. Civ. P. 26 (b) (1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim . . . and *proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit*." (Emphasis supplied.) See also *Bowden* supra (noting that, unlike OCGA § 9-11-26, Fed. R. Civ. P. 26 has been substantially amended over the years, "including several amendments to narrow the scope of discovery").

A21A0043.  GENERAL MOTORS LLC v. BUCHANAN et al.

DILLARD, Presiding Judge, concurring fully and specially.

Although I fully concur in the majority's thoughtful and well-reasoned opinion, I do sympathize with the concerns expressed by General Motors about the potential for litigants to use Georgia's forgiving discovery standards to unduly burden high ranking executives and negatively impact business in our state. Even so, I agree with the majority that our hands are tied. The Apex Doctrine may very well be a policy that Georgia should adopt, but it will have to be the General Assembly or our Supreme Court that does it. I am not in favor of fashioning such a doctrine out of wholecloth, no matter how desirable the underlying policy may be for Georgia's business environment. This issue is, to put it plainly, above our pay grade.